J-S66004-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JAMES BANKS, | |
| Appellant | No. 1286 WDA 2016 |

Appeal from the Judgment of Sentence Entered July 14, 2016
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s):  CP-02-CR-0015867-2014

BEFORE:  BENDER, P.J.E., DUBOW, J., and PLATT, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED DECEMBER 18, 2017**

Appellant, James Banks, appeals from the judgment of sentence of and aggregate term of 26-52 years' incarceration, followed by 5 years' probation, imposed after his conviction for attempted homicide, robbery, and related offenses.  Appellant challenges the weight of the Commonwealth's evidence supporting his identity as the perpetrator of the crimes at issue in this case, the discretionary aspects of his sentence, as well as its legality. We reject Appellant's weight challenge.  However, we are compelled to vacate Appellant's sentence and to remand for resentencing due the imposition of an illegal sentence.  Consequently, we decline to address Appellant's discretionary-aspects-of-sentencing claim at this time.

_____

[*] Retired Senior Judge assigned to the Superior Court.

A full recitation of the facts adduced at trial is provided in the trial court's opinion. *See* Trial Court Opinion (TCO), 2/15/17, at 3-8. Briefly stated, the victim, Anthony Matthews, was sleeping in his City of Pittsburgh apartment at approximately 8:30 a.m. on October 10, 2014, when he awoke to find three knife-wielding men standing at his bedside. *Id.* at 3. Appellant immediately recognized two of the unmasked men, Appellant and Jerome Banks, as the younger brothers of his former girlfriend, London Banks. *Id.* The third man demanded money. *Id.* at 4. As Matthews attempted to get out of his bed, one of the intruders stabbed him in the abdomen. *Id.* When Matthews began to struggle with his assailants, Appellant stabbed him in the back. *Id.* The melee continued for some time, until Matthews heard Appellant tell his brother, Jerome, "[h]it him, hit him, hit him." *Id.* Jerome then struck Mathews in the head six or seven times with a brick. *Id.* After this, Appellant and his cohorts fled, but not before stealing a game system and a laptop from the Matthew's apartment. *Id.* at 5.

Matthews managed to call 911 while he crawled into the hallway of his apartment building, where a neighbor assisted him. *Id.* In the ambulance on the way to the hospital, and believing he was going to die, Matthews told the attending paramedic that he was stabbed by his ex-girlfriend's brothers. *Id.* at 6. Although he survived, Matthews was placed in a medically induced coma for two days before police could speak with him. *Id.* When the police were finally able to communicate with Matthews, he identified Appellant and Jerome Banks as his assailants. *Id.* Matthews' injuries required multiple

surgeries, resulted in extensive nerve damage in his hands and back, and left him struggling with post-traumatic stress, including severe anxiety and sleeplessness. *Id.* at 7.

The Commonwealth charged Appellant with attempted homicide, 18 Pa.C.S. § 901; robbery, 18 Pa.C.S. § 3701(a)(1); burglary, 18 Pa.C.S. § 3502(a)(1); aggravated assault, 18 Pa.C.S. § 2702(a)(1); as well as conspiracy to commit each of those offenses, 18 Pa.C.S. § 903. Following a trial held on December 2-3, 2015, the jury found Appellant not guilty of conspiracy to commit homicide, but guilty of all the remaining charges. On July 14, 2016, the trial court sentenced Appellant to 15-30 years' incarceration for attempted homicide, with consecutive terms of 7-14 years' and 4-8 years' incarceration for conspiracy to commit robbery and burglary, respectively, and a concurrent term of 8-16 years' incarceration for robbery. The trial court also ordered Appellant to serve a consecutive term of 5 years' probation for robbery. Thus, Appellant received an aggregate sentence of 26-52 years' incarceration and 5 years' probation.

Appellant timely filed post-sentence motions challenging the weight of the evidence supporting his convictions and the discretionary aspects of his sentence. The trial court denied Appellant's post-sentence motions on August 5, 2016, from which he filed a timely notice of appeal. Appellant filed a timely, court-ordered Pa.R.A.P. 1925(b) statement on December 5, 2016, and the trial court issued its Rule 1925(a) opinion on February 15, 2017.

Appellant now presents the following questions for our review:

> I. Did the trial court abuse its discretion in denying the post-sentence motion that the verdict was contrary to the weight of the evidence presented in that no physical or scientific evidence, including fingerprints, DNA, weapons, or inculpatory statements were presented implicating [Appellant] in the commission of the crimes, the victim gave three different versions of the facts, named persons other than [Appellant] as his attackers, and [Appellant] presented an alibi?
>
> II. Did the trial court abuse its discretion in sentencing [Appellant] to an aggregate term of 26 to 52 years of imprisonment, to be followed by 5 years of probation, in that the sentence is manifestly unjust, unreasonable, and excessive, is contrary to the Sentencing Code, and the fundamental norms underlying the sentencing process in that the court failed to apply, as it must, all required sentencing factors including the gravity of the offense in relation to the impact on the victim, the history, character and condition of the defendant, and his rehabilitative needs?
>
> III. Did the trial court err in imposing an illegal sentence on Count 3 (Robbery), as the sentence imposed is greater than the lawful maximum?

Appellant's Brief at 9.

Appellant's first claim asserts that the trial court abused its discretion in denying his post-sentence motion claim that the verdict was against the weight of the evidence with respect to Appellant's identity as one of the three assailants. We apply the following standard of review to a challenge that a verdict is against the weight of the evidence:

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:
>
> > Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained:

The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (internal citations omitted).

After reviewing the certified record, the parties' briefs and arguments contained therein, as well as the trial court's thorough and well-reasoned Rule 1925(a) opinion, authored in this case by the Honorable Beth A. Lazzara, we conclude that the trial court did not abuse its discretion in denying Appellant's post-sentence motion claim that the verdict was against

the weight of the evidence. We rest our holding on the basis set forth in the trial court's opinion. *See* TCO at 8-19.

For ease of disposition, we now turn to Appellant's third claim, whereby he asserts that his sentence for robbery is illegal because it exceeded the statutory limit for that offense. The Commonwealth concedes the illegality of the sentence.

"The issue of whether a sentence is illegal is a question of law and our scope of review is plenary." *Commonwealth v. Crump*, 995 A.2d 1280, 1283 (Pa. Super. 2010). If a sentence is illegal, "whether it was properly preserved below is of no moment, as a challenge to the legality of sentence cannot be waived." *Commonwealth v. Dickson*, 918 A.2d 95, 99 (Pa. 2007). Furthermore, a "sentence that exceeds the statutory maximum is illegal. If a court imposes a sentence outside of the legal parameters prescribed by the applicable statute, the sentence is illegal and should be remanded for correction." *Commonwealth v. Infante*, 63 A.3d 358, 363 (Pa. Super. 2013) (internal citations and quotation marks omitted).

Robbery, a first-degree felony, carries a maximum possible sentence of 20 years' incarceration. 18 Pa.C.S. § 1103(1). As detailed above, the trial court imposed a 'split sentence' for Appellant's robbery conviction: 8-16 years' incarceration, with a consecutive term of 5 years' probation. Consequently, Appellant faces the potential of serving up to 21 years' punishment for his robbery offenses, thereby exceeding the statutory maximum punishment of 20 years. *See, e.g., Crump*, 955 A.2d at 1284

- 6 -

(stating that "where the [statutory] maximum [sentence] is ten years['] incarceration], a defendant cannot receive a term of incarceration of three to six years followed by five years['] probation"). Therefore, we agree with Appellant and the Commonwealth that Appellant's sentence for robbery is illegal. Accordingly, we are compelled to vacate Appellant's sentence in its entirety and remand for resentencing, as it is possible that a correction of Appellant's illegal sentence will upset the overall sentencing scheme envisioned by the trial court. **Infante, supra**; **see also Commonwealth v. Dobbs**, 682 A.2d 388, 393 (Pa. Super. 1996) (stating that "[w]here we determine that a sentence must be corrected, this Court has the option of amending the sentence directly or remanding it to trial court for re-sentencing. If a correction by this Court may upset the sentencing scheme envisioned by the trial court, the better practice is to remand").

Finally, because we must remand for resentencing, we decline to address Appellant's second claim, which concerns the discretionary aspects of the vacated sentence.

Judgment of sentence **vacated**. Case **remanded** for resentencing. Jurisdiction **relinquished**.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/18/2017

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA,     CC No. 2014-15867

v.

JAMES BANKS,



ORIGINAL
Criminal Division
OPINION Dept. of Court Records
Allegheny County, PA.

Defendant.

BETH A. LAZZARA, JUDGE
Court of Common Pleas

Copies Sent To:

Mike W. Streily, Esq.
Office of the District Attorney
401 Courthouse
Pittsburgh, PA 15219

Suzanne Swan, Esq.
310 Grant Street
Suite 823
Pittsburgh, PA 15219



IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,     CRIMINAL DIVISION

vs.                                CC No. 2014-15867

JAMES BANKS,

Defendant.

OPINION

This is a direct appeal from the judgment of sentence entered on July 14, 2016, following a jury trial that took place between April 6, 2016 and April 8, 2016. The Defendant was charged in a five (5) count information as follows: Count One (1): Criminal Attempt - Homicide (18 Pa. C.S.A. §901(a)); Count Two (2): Criminal Conspiracy to commit Homicide, Robbery, Burglary, and Aggravated Assault (18 Pa. C.S.A. §903); Count Three (3): Robbery – Serious Bodily Injury (18 Pa. C.S.A. §3701(a)(1); Count Four (4): Burglary (18 Pa. C.S.A. §3502(a)(1)); and Count Five (5) Aggravated Assault (Pa. C.S.A. §2702(a)(1)). At the conclusion of trial, the jury found the Defendant not guilty of Conspiracy to Commit Criminal Homicide, but guilty of all of the remaining charges. Sentencing was deferred to allow for the preparation of a Pre-Sentence Report ("PSR").

1

On July 14, 2016, the Defendant was sentenced to an aggregate sentence of 26 to 52 years of imprisonment with a five (5) year period of probation to follow upon his release from imprisonment. Specifically, the Defendant was sentenced to a period of fifteen (15) to thirty (30) years of incarceration at Count One (1), and a period of seven (7) to fourteen (14) years of incarceration at Count Two (2), which was ordered to run consecutively to the sentence imposed at Count One (1). At Count Three (3), the court sentenced the Defendant to a period of eight (8) to sixteen (16) years of incarceration, which was ordered to run concurrently with the sentences imposed at the previous counts. A five (5) year term of probation was also imposed at Count Three (3), and the probation term was ordered to commence upon the Defendant's release from imprisonment. At Count Four (4), the Defendant was sentenced to a period of four (4) to eight (8) years of imprisonment, which was ordered to run consecutively to Counts One (1) and Two (2). No further penalty was imposed for the Aggravated Assault conviction at Count Five (5) because the conviction merged with the Attempted Homicide conviction at Count One (1). Court costs were imposed, and the Defendant received 412 days of credit for time served. The Defendant also was ordered to have no contact with the victim, Anthony Matthews, or his family. The Defendant filed a timely post-sentence motion, which was heard and denied on August 5, 2016. This timely appeal followed.

On December 5, 2016, the Defendant filed a timely Concise Statement of Errors Complained of on Appeal ("Concise Statement"), raising two (2) issues for review. (Concise Statement, pp. 2-4). The Defendant argues that this court abused its

2

discretion in denying the post-sentence motion because the verdict was against the weight of the evidence, and he contends that this court abused its discretion in imposing sentence. The Defendant's allegations of error on appeal are without merit. The court respectfully requests that the Defendant's convictions and sentence be upheld for the reasons that follow.

## I. FACTUAL BACKGROUND

On the morning of October 10, 2014, at approximately 8:30 a.m., the victim, Anthony Matthews, was asleep in his bedroom when he was suddenly awakened by three (3) African-American men standing at his bedside. (Jury Trial Transcript ("TT") (Volume I), 4/5/16-4/8/16, pp. 72, 87, 89, 94, 96, 102-03, 127, 136, 142-44). The intruders had broken into his apartment at 100 Moore Avenue, located in the Knoxville/Mt. Oliver area of the City of Pittsburgh. (TT, pp. 72, 89-90, 127, 136, 165). All three (3) men were armed with weapons, and they made no attempt to mask their identities. (TT, pp. 136-37, 140). Mr. Matthews was immediately able to recognize two (2) of the intruders as James and Jerome Banks, the younger brothers of his ex-girlfriend, London Banks. (TT, pp. 129-31, 134, 137, 140). Mr. Matthews was well familiar with the Banks brothers. (TT, pp. 129-31). He knew exactly what the Banks brothers looked and sounded like because he had spent time with them on multiple occasions during the time that he was dating their sister. (TT, pp. 129-31). The Defendant, James Banks, knew exactly where Mr. Matthews lived because London Banks had briefly resided with Mr. Matthews during the time that they were dating, and

3

the Defendant had been inside of Mr. Matthews' apartment on at least one (1) prior occasion. (TT, pp. 131-32, 135-36).

Mr. Matthews woke up to an unidentified man yelling "Where's the money? Where's the money?" (TT, pp. 73, 81, 136-37, 144-45). Armed with a knife, the unidentified man was standing on the side of Mr. Matthews' bed, and he stabbed Mr. Matthews in the abdomen as Mr. Matthews was attempting to stand up in order to get out of bed. (TT, pp. 136-37, 145). Mr. Matthews began fighting with the unidentified man, and, with his right hand, Mr. Matthews grabbed the knife that the man was holding. (TT, pp. 137, 145). During the struggle, Mr. Matthews felt himself get stabbed in the back. (TT, pp. 137-38, 145). When he turned around, he realized that the Defendant was also armed with a knife and that the Defendant had been the one who had stabbed him in the back. (TT, pp. 137, 145).

As Mr. Matthews tried to push the Defendant away from him, the unidentified man stabbed him again, this time in the side. (TT, pp. 137, 145-46, 161). Mr. Matthews turned back around to grab the knife from the unidentified man, and, as he continued to struggle for the knife, the co-Defendant, Jerome Banks began hitting Mr. Matthews repeatedly in the head with a brick, delivering between six (6) and seven (7) blows. (TT, pp. 137-38, 145-46, 162). Mr. Matthews heard the Defendant yell to his brother Jerome, "[h]it him, hit him, hit him." (TT, pp. 137, 146). Shortly thereafter, the Defendant and his brother ran out of the bedroom, leaving Mr. Matthews alone with the

4

unidentified male. (TT, pp. 137-38, 146). At that point, Mr. Matthews, who still had a grip on the unidentified male's knife, released his grip from the knife, which allowed the man to flee from the apartment. (TT, pp. 138, 146). Before leaving the apartment, however, the three (3) men stole Mr. Matthews' Playstation 3 gaming system and laptop from his living room, and they smashed his television with the same brick that Jerome Banks had used to repeatedly hit him in the head. (TT, pp. 138-39, 153, 161-63, 274).

After the third male ran out of his bedroom, Mr. Matthews stumbled out into his living room screaming, "I don't have anything, I swear to God I don't have any money, I don't have anything for you all to take." (TT, pp. 73, 84, 138). Mr. Matthews collapsed on the floor of his living room. However, he managed to call 911 on his cell phone. (TT, pp. 147-48). Mr. Matthews then crawled across his living room floor and out into the hallway of his apartment building. (TT, pp. 90, 147, 161, 204). His next-door neighbor, Donald Fuller, heard the struggle take place. Mr. Fuller came outside of his apartment and tried to assist Mr. Matthews. Mr. Fuller had seen three (3) black men fleeing from Mr. Matthews apartment when he peered through his peephole after he heard the commotion outside. (TT, pp. 72-75, 77-80, 82, 147-49).

Law enforcement officials were dispatched to the scene at approximately 8:56 a.m. (TT, pp. 88-89). Officers and medical personnel arrived within minutes and found Mr. Matthews in the hallway outside of his apartment, laying in a large pool of his own blood. (TT, pp. 89-92, 104-05,147-48, 204). Mr. Matthews was bleeding profusely, and

5

he was fading in and out of consciousness due to the amount of blood loss he had sustained. (TT, pp. 90-92, 104). Mr. Matthews was in substantial pain due to the "multiple severe stab wounds" that he suffered. (TT, pp. 103-04, 148). His intestines were hanging out of his body, and he was struggling to breathe because of a stab wound to his lung. (TT, pp. 75, 105-06, 151). Mr. Matthews was transported in an ambulance to Mercy Hospital. (TT, pp. 93, 107-08, 150). While he was in route to the hospital, Mr. Matthews began panicking, believing that he was going to die, and he attempted to provide paramedic Shawn Eigenbrode with information about the attack. (TT, pp. 107-09, 150-51). Although he was struggling to breathe through an oxygen mask, Mr. Matthews asked Mr. Eigenbrode to tell his mother, father, and daughter, if he did not survive, that he loved them. (TT, pp. 105, 107,120-121, 150-51). Mr. Matthews also relayed to Mr. Eigenbrode that he was stabbed by his ex-girlfriend's brothers and that there were three (3) men who attacked him. (TT, pp. 109-10, 113-15, 150). When Mr. Eigenbrode asked the name of his ex-girlfriend, Mr. Matthews replied, "London Banks." (TT, pp. 110, 150).

Upon his arrival at Mercy Hospital, Mr. Matthews was put into a medically induced coma for approximately two (2) days. (TT, p. 151). For approximately the next week, Mr. Matthews remained at the hospital, undergoing various surgeries and treatment. (TT, pp. 151-53). On October 17, 2014, Mr. Matthews' condition stabilized sufficiently that he was able to speak with the police about the attack and stabbing. Mr. Matthews spoke with Detective Judd Emery, identifying his attackers as Jerome and James Banks, the younger brothers of his ex-girlfriend, London Banks. Mr. Matthews

6

was presented with separate photo arrays for each brother, and he positively identified both brothers without any hesitation. He circled their pictures, wrote their nicknames next to their faces, and signed his name. (TT, pp. 167-171; 257-262)

After spending approximately a week in the hospital, Mr. Matthews was discharged. Unfortunately, he was readmitted less than 48 hours later due to various complications from his injuries. (TT, pp. 151-52). Mr. Matthews required yet more surgical procedures, and he developed deep vein thrombosis. (TT, p. 152). He spent nearly a month in the hospital due to the complications that he developed from his stab wounds. (TT, p. 152). He was ultimately discharged from the hospital on November 6, 2014. (TT, pp. 152-53). By the time of trial, Mr. Matthews still was experiencing the symptoms from nerve damage in both of his hands and in his lower back. (TT, p. 153). He continued to struggle with pain in his abdominal area from the scar tissue that had developed after his surgeries. (TT, p. 153). He reported some slight short-term memory loss from the head injury that had been caused by the blows from the brick wielded by Jerome Banks. (TT, pp. 153-54). In addition to his physical injuries, Mr. Matthews struggled with anxiety and post-traumatic stress, and he reported difficulty sleeping since the attack in his bedroom. (TT, p. 153).

Prior to the attack, Mr. Matthews had been working full-time at the Chipotle Mexican Grill. (TT, pp. 128, 154). He primarily worked on the grill and was also training for a management position at the restaurant. (TT, p. 128). Since the stabbing,

7

however, Mr. Matthews has not been able to work in any capacity because he is significantly limited in his ability to use his hands for an extended period of time. (TT, pp. 154-55). It is also difficult for him to work in any position that requires lifting or squatting because of the scar tissue in his stomach and the nerve damage in his back. (TT, p. 154). Mr. Matthews also has difficulty sitting and standing for prolonged periods of time because he experiences severe, sharp pains in his back that shoot down his leg. Mr. Matthews is unsure whether he will be able to work a full workday again. (TT, pp. 154-55).

## II. DISCUSSION

### A. The Defendant's convictions for Attempted Murder, Criminal Conspiracy, Robbery, Burglary, and Aggravated Assault were not against the weight of the evidence.

In his first allegation of error, the Defendant contends that this court "abused its discretion in denying the post-sentence motion [because] the evidence presented was so contrary to the verdict rendered that it shocks one's sense of justice." (Concise Statement, pp. 2-3). In support of his assertion, the Defendant cites to: (i) the lack of physical and scientific evidence implicating the Defendant in the commission of the crimes, (ii) the credibility of the victim and the conditions surrounding his identification of the Defendant, (iii) the fact that the Defendant and the unidentified coconspirator perpetrated the attack using knives from Mr. Matthews' kitchen, (iv) the fact that the Defendant presented an alibi defense at trial, and (v) the apparent lack of motive for the attack. (Id.).

8

It is well-established that a challenge to the weight of the evidence "concedes that there is sufficient evidence to sustain the verdict." Commonwealth v. Widmer, 744 A.2d 745, 751 (Pa. 2000); Commonwealth v. Hunzer, 868 A.2d 498, 507 (Pa. Super. 2005), appeal denied, 880 A.2d 1237 (Pa. 2005) ("A true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict **but questions which evidence is to be believed.**" ) (emphasis added). In reviewing claims that the verdict was against the weight of the evidence, our appellate courts have explained that

> [t]he weight of the evidence is **exclusively for the finder of fact** who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, **appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.**

Commonwealth v. Lewis, 911 A.2d 558, 565 (Pa. Super. 2006) (emphasis added); Commonwealth v. Torres, 578 A3d 1323, 1326 (Pa. Super. 1990) ("The determination whether to grant a new trial on the ground that the verdict is against the weight of the evidence rests within the discretion of the trial court, and we will not disturb that decision absent an abuse of discretion.").

Indeed, "appellate review of a trial court's decision on a weight of the evidence claim is extremely limited." Torres, *supra*, at 1326. Courts have reasoned that

9

> [b]ecause the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence.

Widmer, *supra*, at 753. Stated differently, "[o]ne of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." Commonwealth v. Clay, 64 A.3d 1049, 1055 (Pa. 2013) (quoting Widmer, *supra*, at 753).

In determining whether a trial court abused its discretion in denying a motion for a new trial based on a claim that the verdict was against the weight of the evidence, our Supreme Court has cautioned that

> [a] new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. [Widmer, *supra*, at 751-52]. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" [Widmer, *supra*] at 752 (citation omitted). It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." [Commonwealth v. Brown, 648 A.2d 1177, 1189 (Pa. 1994)].

Clay, *supra*, at 1055.

This court did not abuse its discretion in denying the Defendant's post-sentence motion because the verdict was not against the weight of the evidence. To the contrary,

10

the weight of the evidence presented at trial was substantially against the Defendant and his brother, Jerome Banks. Although the Defendant correctly notes that the Commonwealth was unable to present physical or scientific evidence linking him to the crime, his "CSI" argument loses substantial force when considered against the evidence as a whole, and it seeks to distract one's attention away from the fact that the determination of guilt in this case was centered on credibility determinations and the resolution of conflicting testimony, matters that are solely within the province of the jury.

Although this court did not sit as the fact-finder, it presided over the trial and closely studied the victim as he recounted the horrific events that unfolded on October 10, 2014. At all times throughout the proceedings, Mr. Matthews came across as sincere, genuine, and highly credible. He testified calmly, confidently and consistently, and his credibility was bolstered by other compelling pieces of evidence that corroborated his account of what transpired on October 10, 2014.

One of the most salient pieces of evidence in this case was the fact that Mr. Matthews identified the Banks brothers as his attackers on the way to the hospital, while believing he was going to die. (TT, pp. 107-09, 150). Mr. Matthews told paramedic Shawn Eigenbrode, as he was bleeding out and struggling to breathe, that he was stabbed by his ex-girlfriend's younger brothers. (TT, pp. 107-09,121,150-51). When the paramedic asked the name of his ex-girlfriend, Mr. Matthews replied, "London Banks." (TT, pp. 110, 150). Mr. Eigenbrode testified at trial and corroborated Mr. Matthews'

11

testimony. Specifically, Mr. Eigenbrode confirmed that, while they were in the ambulance, Mr. Matthews asked him, "Am I going to die?" and he also testified that Mr. Matthews told him he was attacked by "his ex's brothers." (TT, 107-109). Although Mr. Matthews' injuries were not ultimately fatal, Mr. Matthews essentially made a dying declaration to Mr. Eigenbrode when he identified his attackers in the ambulance, because he genuinely believed he was going to die. Our Supreme Court has recognized the reliability of dying declarations, noting that such reliability "is based on the premise that no one who is immediately going into the presence of his Maker will do so with a lie upon his lips." Commonwealth v. Smith, 314 A.2d 224, 225 (Pa. 1973) (internal quotations omitted). For that reason, our Supreme Court has even stated that dying declarations "should be considered as the equivalent of testimony given under oath in open Court" because an individual who believes that death is imminent is "more likely to tell the truth than is a witness in Court who knows that if he lies he will have a locus penitentiae, an opportunity to repent, confess and be absolved of his sin[.]" Commonwealth v. Brown, 131 A.2d 367, 369-370 (Pa. 1971).

Thus, the fact that Mr. Matthews identified the Banks brothers as his attackers while he thought he was dying on the way to the hospital makes his identification highly credible and worthy of belief. It should be noted that at trial, the defense attempted to undermine the identification made in the ambulance by claiming that Mr. Matthews identified his ex-girlfriend as "Linda Bey." (TT, pp. 114-16, 121, 222). This argument is nothing more than an attempt to mislead the jury. When considered against the evidence in its entirety, it is clear that the "name issue" is a desperate attempt by the

12

defense to attack the credibility of the victim. Considering Mr. Matthews' physical condition, the noise from the ambulance's sirens, the fact that Mr. Matthews was "panicking" and that he was trying to speak through an oxygen mask, with a punctured lung, at the time he made his identification, Mr. Eigenbrode understandably could have been confused as to the name that he thought that he heard. (TT, pp. 120-21). This is even more likely given that "London" is a much less common name than "Linda". Given how similar the names sound even without all of the background noise, Mr. Eigebrode's confusion as to the name is easily understood. In any event, any discrepancy as to the identification of the perpetrators was for the jury to consider and resolve. The jurors obviously resolved this "discrepancy" in Mr. Matthews' favor after weighing the evidence as a whole. It should also be noted that Mr. Matthews identified his attackers as the brothers of his ex-girlfriend, no matter what name was heard or mis-heard, and he testified credibly that he did not even know, let alone date, a Linda Bey.

Any doubt as to whether Mr. Matthews said the name "Linda Bey" or "London Banks" is further cast away by the fact that Mr. Matthews identified the Banks brothers as his attackers two (2) more times in the week following his attack. Detectives Emery and Bolin initially went to the hospital on the day of the stabbing to talk to Mr. Matthews, but they were unable to speak with him because of his condition. (TT, p. 257). On October 14, 2014, Detectives Emery and Bolin returned to the hospital, and they were able to have a brief conversation with Mr. Matthews about the attack. (TT, p. 257). Mr. Matthews told them that he knew two (2) of his attackers because they were his ex-girlfriend's brothers, and he identified his ex-girlfriend as London Banks. (TT, p. 257).

13

On October 17, 2014, Detective Emery returned to the hospital and presented Mr. Matthews with two (2) separate photo arrays for purposes of making an official identification. (TT, pp. 167-71, 257-262). Mr. Matthews had no trouble positively identifying the brothers in each array. He circled their pictures, wrote their nicknames "Jimmy" (James Banks) and "Rome" (Jerome Banks) next to their respective pictures, and signed his name. (TT, pp. 167-261-62). Thus, from the time of the attack throughout all the proceedings, Mr. Matthews consistently maintained that the Banks brothers were responsible for his stabbing, which further demonstrates the reliable and credible nature of his testimony.

Although the Defendant attempts to undermine the circumstances surrounding his ability to see his attackers, this argument is unavailing in light of the fact that the attack happened around 8:30 a.m. in the morning, and the sheer curtains in Mr. Matthews' bedroom were open when the attack occurred. (TT, pp. 142, 277). Additionally, the attackers made no efforts to cover or mask themselves. Mr. Matthews was easily able to identify the familiar faces that he saw in his room. Additionally, he was able to recognize their voices, as well as their appearances.

The court further notes that, although there were no other eyewitnesses that could speak to the identity of the attackers, the testimony of Mr. Matthews' next-door neighbor, Donald Fuller, also lent substantial credibility to Mr. Matthews' account of what transpired. As noted, Mr. Fuller and Mr. Matthews' apartments shared a common

14

wall. Because the walls were thin, Mr. Fuller was able to hear the attack take place. (TT, pp. 72-74). He testified that he and his girlfriend were actually awakened by the sound of a struggle taking place in Mr. Matthews' apartment. Mr. Fuller testified that it sounded like people were "wrestling" or "playing football" in the apartment. (TT, pp. 72-73). Significantly, Mr. Fuller heard a man say, "Give me the money, give me the money," and he heard Mr. Matthews respond by saying "I don't got no money, I don't got no money." (TT, p. 73). Mr. Fuller then looked out the peephole in his front door and saw three (3) black men running out of Mr. Matthews' apartment and down the stairs of the apartment building. (TT, pp. 74, 78, 80). Mr. Fuller credibly corroborated key details of the victim's account of the incident.

Mr. Fuller's testimony also corroborated another relevant point regarding the entry into the apartment building. Mr. Matthews testified that, although he lived in a "secure" building, the security door was anything but secure because it easily could be opened with the use of a credit card. (TT, pp. 165, 179). Mr. Matthews testified that he showed London Banks how to open the door with a credit card during the time that she resided with him. Mr. Fuller testified that "everybody was accessing [the security door] through a credit card." (TT, pp. 84, 165, 179). Detective Emery further corroborated the ease with which the building could be accessed, testifying that he used a business card to gain entry into the building. (TT, p. 281). Given that the Defendant's sister knew how to access the building, and given that the Defendant had been in Mr. Matthews' apartment on at least one (1) prior occasion, this was another link in the chain of evidence that was relevant to the determination of guilt in this matter. (TT, pp. 165-66).

15

With respect to the lack of physical and scientific evidence in this case, the court notes that Mr. Matthews' *own fingerprints* could not be lifted from his *own* apartment door. (TT, p. 276). Additionally, no testing was conducted on the security door of the building because of the amount of traffic that flows through that door and because the officers touched the door when they were conducting their investigation. (TT, p. 280). No scientific testing could be conducted on the knives that were used in the attack because they were never located. The brick used by Jerome Banks was tested, but, because of the nature of its surface, there was no evidence that could be successfully lifted from it. (TT, pp. 241-42).

The Defendant also suggests that it was illogical that he and his unidentified co-conspirator armed themselves with knives from Mr. Matthews' own apartment instead of bringing their own weapons with them. (TT, pp. 140-41, 230). Again, this was an argument that was for the jury to consider. The jurors evidently rejected this argument, perhaps because it is well-understood that criminals often do not behave logically and are opportunistic. Moreover, Mr. Matthews testified that he recognized the knives as his own, and he never saw them again after the incident. Regardless of when and how the intruders armed themselves, the fact remains that they were armed with deadly weapons and used those weapons to inflict serious bodily injury upon the victim.

The Defendant also attempts to undermine the victim's credibility by arguing that it was illogical for him to keep his door unlocked given the neighborhood in which he lives. To that end, Mr. Matthews testified he had a "bad habit" of leaving his apartment door unlocked. He further testified credibly that the door was left unlocked the morning of the incident because his new girlfriend had left his apartment at 2:00 a.m. to go to work, and he forgot to lock the door behind her. (TT, pp. 182-83, 272). Even if Mr. Matthews could have exercised more care in securing entry into his own apartment, the reason why his door was unlocked was easily explained by him and is ultimately irrelevant to the question of who attacked him.

Finally, the Defendant contends that the verdict was against the weight of the evidence because he presented an "alibi" defense at trial. His alibi defense, however, was not based on any piece of objective evidence, but rather the testimony of his child's mother, Angela Teasley, and her mother, Tiffany Teasley. (Jury Trial Transcript, Volume II ("TT2"), 4/5/16-4/8/16, pp. 5-47). The Defendant's alibi defense relied solely on whether the jury found the Teasley women to be credible, and it is not at all surprising that the jurors ultimately rejected the alibi defense as not worthy of belief.

First, Angela and Tiffany Teasley were interviewed by a defense investigator on June 29, 2015 at the same time, in the same room, thereby allowing them to align their stories. (TT2, pp. 7, 16, 22, 24). Second, Angela Teasley materially changed the details of her alibi defense between the time of her statement and trial. Specifically, she

17

first claimed that she was able to remember exactly where the Defendant was on the day of the incident because on October 9, 2014, the day before the incident, the Defendant accompanied her to Magee Women's Hospital to find out the gender of their baby. (TT2, pp. 8, 22-27). She admitted that she had used that hospital date as the lynchpin for determining where the Defendant was on October 10, 2014. (TT2, p. 28). However, after finding out that the Commonwealth would be able to prove through medical records that she was never at the hospital on October 9, 2014, Angela Teasley changed her story and said that the Defendant was at her mother's house with her from October 9, 2014 until October 11, 2014, and that the couple did not leave the house at all for those three (3) days. (TT2, pp. 13-14, 28-29).

The court notes that it had the opportunity to observe Angela Teasley as she testified, and her testimony was not credible in the least. Between her demeanor and tone, her obvious bias and her desire to keep her child's father from going to prison, it is not surprising that the jury rejected her testimony and found it unworthy of belief. This court notes that it found, after hearing the same testimony as the jurors, that Ms. Teasley's alibi testimony was entirely unworthy of any belief.

It is also no mystery why the jury also rejected the testimony of "alibi" witness Tiffany Teasley. The court notes that Tiffany Teasley cannot even be considered a proper alibi witness because she could not account for the Defendant's whereabouts during the specific timeframe of the attack. (TT2, pp. 43-45). Although she testified that

18

the Defendant was at her house between October 9, 2014 and October 11, 2014, she specifically testified that she was asleep until almost noon on the day of the incident. (TT2, pp. 39, 42-45). Tiffany Teasley, therefore, was unable to place the Defendant at her home at the time of the attack, and she had no way of knowing where the Defendant was at approximately 8:30 a.m., when the attack on Mr. Matthews occurred.

Accordingly, for all of the reasons cited above, there is no merit to the Defendant's claim that he deserved a new trial because the verdict was against the weight of the evidence. The Defendant's challenge to the weight of the evidence is, at its core, an invitation for the appellate court to reweigh the evidence and second-guess the credibility determinations made by the jury in this case. The reviewing court respectfully should decline to accept such an invitation because "[i]t was the function of the jury as the finder of fact to evaluate the evidence and determine the weight it should be given." Lewis, supra, at 566. All of the purported weaknesses in the Commonwealth's case as were outlined in the Defendant's Concise Statement were matters for the jury to resolve. Based on the foregoing discussion of evidence, the jurors' assessment of the evidence and their credibility determinations did not shock this court's sense of justice in any way. There were no facts in this case that were "so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." Clay, supra, at 1055. To the contrary, the weight of the evidence was squarely against the Defendant, and this court did not abuse its discretion when it denied his motion for a new trial.

19

**B. This court did not abuse its discretion when it imposed an aggregate sentence of imprisonment of 26 to 52 years of imprisonment.**

The Defendant contends that his standard range sentences were "manifestly unjust, unreasonable, and excessive," and he argues that the court abused its discretion when it imposed consecutive sentences. (Concise Statement, pp. 3-4). In support of his argument, he claims that the court "failed to appropriately consider" his history, character, substance abuse problems, and rehabilitative needs. He also cites to the fact that his criminal background involved only non-violent misdemeanor crimes and that he expressed remorse at sentencing. (Id. at 3-4).

It is well-settled that "[s]entencing is a matter vested in the sound discretion of the sentencing judge and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." Commonwealth v. Mouzon, 828 A.2d 1126, 1128 (Pa. Super. 2003). "To constitute an abuse of discretion, the sentence imposed must either exceed the statutory limits or be manifestly excessive." Commonwealth v. Gaddis, 639 A.2d 462, 469 (Pa. Super. 1994) (citations omitted). To that end, "an abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." Commonwealth v. Greer, 951 A.2d 346, 355 (Pa. 2008). "In determining whether a sentence is manifestly excessive, the appellate court must give great weight to the sentencing court's discretion." Mouzon, *supra*, at 1128. This deferential standard of review acknowledges that the sentencing court is "in the best position to view the defendant's character,

20

displays of remorse, defiance, indifference, and the overall effect and nature of the crime." Commonwealth v. Allen, 24 A.3d 1058, 1065 (Pa. Super. 2011) (internal citations omitted).

The Defendant's sentencing argument seeks to challenge the discretionary aspects of sentencing. The court notes that "[t]he right to appeal a discretionary aspect of sentence is not absolute." Commonwealth v. Martin, 727 A.2d 1136, 1143 (Pa. Super. 1999). A defendant "challenging the discretionary aspects of his sentence must invoke [appellate] jurisdiction by satisfying a four-part test." Commonwealth v. Moury, 992 A.2d 162, 170 (Pa. Super. 2010). In conducting the four-part test, the appellate court analyzes

> (1) whether appellant has filed a timely notice of appeal, see Pa. R. A. P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, see Pa. R. Crim. P. [708]; (3) whether appellant's brief has a fatal defect, Pa. R. A. P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa. C. S. A. § 9781(b).

Id. at 170. "The determination of whether there is a substantial question is made on a case-by-case basis, and [the appellate court] will grant the appeal only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." Commonwealth v. Haynes, 125 A.3d 800, 807 (Pa. Super. 2015).

21

Our courts have "held on numerous occasions that a claim of inadequate consideration of [mitigating] factors does not raise a substantial question for [] review." Haynes, supra, at 807; Commonwealth v. Buterbaugh, 91 A.3d 1247, 1266 (Pa. Super. 2014). Furthermore, "a sentencing court generally has discretion to impose multiple sentences concurrently or consecutively, and a challenge to the exercise of that discretion does not ordinarily raise a substantial question." Commonwealth v. Raven, 97 A.3d 1244, 1253 (Pa. Super. 2014). Moreover, "bald claims of excessiveness due to the consecutive nature of sentences imposed will not raise a substantial question." Commonwealth v. Dodge, 77 A.3d 1263, 1270 (Pa. Super. 2013). Rather, "[t]he imposition of consecutive, rather than concurrent, sentences may raise a substantial question in only the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment." Moury, supra, at 171-72.

Respectfully, the reviewing court should find that the Defendant has failed to raise a substantial question for review of his sentence. The Defendant's standard range sentences were consistent with the sentencing provisions of the Sentencing Code, and they did not conflict with the fundamental norms that underlie the sentencing process. However, should the Superior Court conclude that there exists a substantial question as to the appropriateness of the sentence, the aggregate sentence imposed was justified by the totality of the circumstances in this case.

22

First, the court notes that it had the benefit of a presentence report to aid in its sentencing determination, and, pursuant to its consistent practice, the court carefully reviewed this report prior to sentencing. (Sentencing Hearing Transcript ("ST"), 7/14/16, pp. 2-3); See Commonwealth v. Tirado, 870 A.2d 362, 368 (Pa. Super. 2005) (noting that "the sentencing court had the benefit of reviewing the presentence investigation report prior to sentencing . . . and, as such, it is presumed that the sentencing court 'was aware of the relevant information regarding defendant's character and weighed those considerations along with mitigating statutory factors.'") (internal citations omitted). The court specifically noted at sentencing that it had reviewed the presentence report *three (3) separate times* in preparation for sentencing. (ST, p. 3). This court, therefore, was well-familiar with the Defendant's personal background, criminal history, and substance abuse issues, and it took each one of those factors into account in determining what sentence would be appropriate in this case. (ST, p. 35).

Second, the court considered a number of different factors beyond the heinous and serious nature of the Defendant's crimes. In addition to giving meaningful consideration to the Defendant's background, history, and need for rehabilitation, the court considered the arguments of counsel at sentencing, the victim impact testimony from Mr. Matthews and his mother, and the Defendant's allocution to the court. (ST, pp. 10-29).

This court would note that the victim's testimony at sentencing was particularly impactful. Having closely studied the victim as he testified at trial, and again during sentencing, the court found Mr. Matthews to be extremely credible and sincere in his description, not only of the events that transpired on the day of the incident, but also in his description of the physical and emotional pain that he continues to struggle with as a result of his brutal attack that almost took his life. The effects of the stabbing have completely derailed Mr. Matthews from the management track that he was on before the incident, and, at the time of trial, he still had not been able to return to work. Mr. Matthews does not know whether he will ever be able to work a full work day in the future. He continues to have difficulties and challenges with even the most basic of bodily functions, such as grip strength. His mother's testimony also noted that his relationship with his child has changed fundamentally, as he cannot interact and play with his child in the manner that he was able to prior to the attack. His basic ability to be a father has been compromised.

The Defendant and his co-conspirators robbed the victim of much more than his electronic possessions. They robbed him of his sense of security inside of his own apartment and broke his trust in society as a whole. The stabbing has caused Mr. Matthews to suffer from anxiety and post-traumatic stress. Mr. Matthews has been robbed of one of the most precious commodities – sleep. He is unable to sleep because the attack occurred while he was in his bed, the place where one should always feel most safe.

24

While counsel attempted to re-litigate the facts of the case at sentencing, and while the Defendant maintained his innocence in the matter, the jury rejected his alibi defense at trial, likely because it was entirely unworthy of belief and unable to be corroborated by any objective and unbiased evidence. As noted above, the alibi witnesses had close ties to the Defendant and, thus, had every incentive to testify favorably for the Defendant.

As the Defendant acknowledges in his Concise Statement, the sentences imposed were standard range sentences, and courts have recognized that "where a sentence is within the standard range of the guidelines, Pennsylvania law views the sentence as appropriate under the Sentencing Code." Commonwealth v. Lamonda, 52 A.3d 365, 372 (Pa. Super. 2012); See also Commonwealth v. Cruz-Centeno, 668 A.2d 536 (Pa. Super. 1995), appeal denied, 676 A.2d 1195 (Pa. 1996) (stating combination of PSI and standard range sentence, absent more, cannot be considered excessive or unreasonable).

In any event, a defendant is not entitled to a concurrent sentencing scheme, and the Defendant in this case certainly was not deserving of a "volume discount" for committing serious crimes that involved breaking into the victim's apartment, brutally stabbing him and almost taking his life, then robbing him of his belongings. *See* Commonwealth v. Hoag, 665 A.2d 1212, 1214 (Pa. Super. 1995) ("The general rule in Pennsylvania is that in imposing a sentence the court has discretion to determine

25

whether to make it concurrent with or consecutive to other sentences then being imposed or other sentences previously imposed."); <u>Commonwealth v. Anderson</u>, 650 A.2d 20, 22 (Pa. 1994) (raising a concern that defendants not be given "volume discounts" for multiple criminal acts that arose out of one larger criminal transaction).

Accordingly, after considering all of the evidence presented at trial and sentencing, as well as all of the statutory factors set forth in 42 Pa. C.S.A. §9721(b), this court's decision to employ a consecutive sentencing scheme so as to impose an aggregate sentence 26 to 52 years of imprisonment was justified by the totality of the circumstances in this case. While the court considered the mitigating aspects of the Defendant's circumstances, it found that the mitigating factors did not outweigh other relevant considerations outlined above. The Defendant's conduct demonstrates a disregard for the law and an indifference to the value of human life, and this, in turn, creates a substantial need to protect the public from his behavior. Accordingly, this court did not abuse its discretion in imposing sentence, and this allegation of error should be rejected on appeal.

## III. **CONCLUSION**

The Defendant's contentions on appeal are without merit. Based on the foregoing, the verdict was not against the weight of the evidence, and the sentence imposed was not an abuse of discretion. Accordingly, this court respectfully requests that the verdict and sentence in this case be upheld.

BY THE COURT:

_____, J.
BETH A. LAZZARA, JUDGE
February 15, 2017

27